**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE, JANE DOE, in their** | : | **CIVIL ACTION** |
| **individual capacities, and as parents and** | : | |
| **natural guardians of James Doe, a minor** | : | |
| | : | |
| **v.** | : | **NO.   24-618** |
| | : | |
| **THE HAVERFORD SCHOOL** | : | |

## MEMORANDUM

**MURPHY, J.**                                                          **October 27, 2025**

The third-grade school year at a private, all-boys elementary school has just begun, and already, one student, James, is significantly struggling.  James's past few years at the school had not been without incident, with problems including biting, kicking, pushing, and distracting classmates.  But this year seems different.  Now, James is frequently misbehaving in class and getting into physical confrontations with his classmates.  The school had to form an internal team specifically focused on supporting him and addressing his behavior.  Though he has had altercations with several classmates, James is physically and verbally combative with one particular student, Student #1.  James is black and Student #1 is white.  At one point, James reports that Student #1 called him the "n word" at school, prompting James's parents to notify the school.  The school looks into this allegation, though its approach is somewhat disorganized, slow, and lacking in clear communication among school personnel.  James's parents are unimpressed with the response.  Following this report, James's struggles continue and escalate, culminating in three days where he hits and verbally threatens Student #1 multiple times, threatens another student, throws scissors across the classroom, and loudly disrupts his fellow students.

The school decides that they can no longer provide a safe and effective learning

environment for its students with James enrolled there, so it asks James's parents to withdraw him from the school mid-year.  James's parents, the Does, acknowledge their son's behavioral issues and admit that they did not witness his conduct during the three-day escalation, but nevertheless dispute the school's narrative of his behavior during that period.  They conclude that the school asked for James's withdrawal because he reported racial discrimination by Student #1.  The Does now want relief, in federal court, for this alleged racial discrimination and retaliation and various related state-based contract and tort claims.

Haverford, the school, vigorously disagrees.  It now seeks summary judgment on all counts.  It also objects to the admission of testimony from the Does' proffered expert, Raymond De Sabato, claiming that he lacks the requisite expertise or comprehensible methods to opine on issues in this case.  Upon consideration of the motions, oppositions, and oral argument in this case, we are persuaded by Haverford on both motions.  Accordingly, we find that (1) Mr. De Sabato's testimony is precluded under Rule 702; and (2) summary judgment in Haverford's favor is warranted on the § 1981 discrimination and retaliation claims.  Because the Does' federal claims are not viable, we decline to exercise supplemental jurisdiction over their remaining state law claims.

## I.    FACTUAL BACKGROUND

Haverford is an all-boys private school serving students from pre-kindergarten (pre-K) through the twelfth grade.  DI 35-1 at ¶ 1.  James Doe, a black child, enrolled in Haverford's pre-K program in 2018 and continued enrolling at Haverford in successive school years.  *Id.* at ¶ 2.  Each year, John and Jane Doe — James's parents — agreed to Haverford's Enrollment Contracts.  *Id.* at ¶ 3.  These contracts stated as follows: (1) James's enrollment at Haverford was

"contingent upon satisfactory academic progress, timely satisfaction of financial obligation[s], and appropriate behavior by student and parent(s)"; and (2) "[s]hould the Headmaster, in his sole discretion, determine that it is not in the best interest of the student or School for the student or parent(s) to continue as members of The Haverford School community, the Headmaster may require the student's withdrawal or dismiss him from the School."  *Id.* at ¶ 3; DI 12-1 at 10.  John and Jane Doe also agreed to abide by Haverford's Lower School Student and Family Handbook, which provides student discipline standards and requires its community members to follow various principles and standards of behavior.  DI 35-1 at ¶ 4; DI 12-1 at 7-8.

During pre-K, Haverford identified issues with James's behavior both inside and outside of school.  These issues involved physical contact with his teachers and friends — including reports that James was "biting kids and kicking their teeth out" — as well as observations of James making angry or mad-looking facial expressions and struggling to verbalize his emotions. DI 35-1 at ¶¶ 5-6.  Several times during first grade, James "pushed a classmate and got quite physical."  *Id.* at ¶ 7.  In second grade, he struggled to follow his teacher's directions, argued, mocked, punched, and kicked another student, and was repeatedly disruptive in class — at one point handing his teacher a note stating that he "hated" his peer.  *Id.*  Jane Doe took James for a developmental evaluation with a neuropsychologist, reporting to the neuropsychologist that James "does not listen to us" at home.  *Id.* at ¶ 8.

In September 2022, James began third grade at Haverford.  *Id.* at ¶ 10.  Haverford had three third-grade rooms that year.  *Id.* at ¶¶ 10-11.  Moreover, Haverford explicitly told parents at the beginning of the September 2022 school year that "[r]equests for changes to class placement will not be granted."  *Id.* at ¶ 11.  Notably, Haverford has never changed an elementary student's

3

home room in the middle of the year, either on its own initiative or by request.  *Id.*  Toward the beginning of the school year, James began exhibiting behavioral issues, which included (1) "pushing back and forth with his classmate [not Student #1]"; (2) misbehaving in class by distracting himself and others during learning; and (3) struggling with peer relationships.  *Id.* at ¶¶ 12-14.  On October 12, 2022, Haverford's student progress monitoring team met to discuss James's progress, noting these issues as well as a conflict that day with Student #1.  *Id.* at ¶ 15. The team developed a plan to support James, which included a direction-following chart to aid in self-regulation, a task-based system to help him de-escalate, and the utilization of staff members as resources for James to discuss his feelings and thoughts.  *Id.* at ¶ 16.

However, James's struggles continued, resulting in further reports of disruptive conduct during class time as of October 17th.  *Id.* at ¶ 17.  Student #1's mother reported that her son was "really struggling with [James]" and James's teacher confirmed that the two boys were "butting heads."  *Id.* at ¶ 18.  At one point, upon seeing James crying at recess, Haverford's Director of Diversity, Equity, and Inclusion, Rhonda Brown, approached James and told him that he should report any issues to her, his teacher, or any other adult.  *Id.* at ¶ 19.  On October 24th, Student #1 reported that James "intentionally stepped on [his] foot hard enough for it to hurt," hit him with a water bottle, and punched him in the arm.  *Id.* at ¶ 20.  James admitted to one of these interactions and, as a result, Haverford called both boys' parents and James missed physical education (PE) class to reflect on his conduct.  *Id.*  Four days later, James grabbed another student and threw him to the ground during a kickball game; both boys' parents were called, and both boys missed the next recess because they omitted information when asked by the teacher. *Id.* at ¶ 21.

James's behavior prompted Haverford to recommend a meeting with John and Jane Doe to discuss James's "intentional physical behavior . . . toward his peers" and develop a plan for him to meet Haverford's expectations. *Id.* at ¶ 22. During this time, Haverford brought in an additional educator to observe James in class, who developed a "ticket recognition system" to motivate him, and created a student support team to "review [James]'s progress . . . share information, and discuss strategies and plans to support his continued learning and growth at school." *Id.* at ¶¶ 23, 25. Shortly after the implementation of the ticket system, James ripped up a negative note his teacher had sent home for his parents' review. *Id.* at ¶ 24.

On November 7th, James's support team met with John and Jane Doe to discuss his behavior and strategies to support him. *Id.* at ¶ 26. At this meeting, Jane Doe "wondered if [Haverford] is the right fit for [James]" and asked his team to "be transparent" about what they were "seeing with [James]'[s] progress at school." *Id.* They concluded the meeting with a plan to meet again with the Does in January. DI 32-4 at 247. Around this time and prior to November 10th, James and Student #1 had a conflict during P.E. class, during which the P.E. teacher reported that James kicked a ball toward Student #1, Student #1 perceived James as intentionally trying to hit him with the ball, and Student #1 pushed James in response. DI 35-1 at ¶ 27. The P.E. teacher addressed the incident with the boys, who apologized to each other. *Id.* At the time of this incident, James did not report that he was called the "n word." *Id.* That same day, upon the boys' return to the classroom, James and Student #1 pushed each other and were then sent to the school counselor for conflict resolution. *Id.* at ¶ 28. Around this time, James's teacher spoke with Jane Doe, who reported that James was struggling with peer relationships and feeling that he could not come to his teacher when he was upset. *Id.* In response, his teacher

5

reported that she was working on relationship-building with James and would be checking on him more frequently.  *Id.*  On November 8th, James refused to go to art class, claiming his refusal was because the art teacher was "mean."  *Id.* at ¶ 29.  Haverford informed Jane Doe of his refusal to go to art class, told the art teacher and counselor about his feelings, and ensured that all of his teachers knew of the counselor's support strategies for him.  *Id.* at ¶ 30.

On approximately November 9th, James reported to his father that Student #1 had called him the "n word" during their interaction in P.E. class two days prior.  *Id.* at ¶ 31.  James told his mother the same information when she asked him about it.  *Id.*  The next day, during a pre-scheduled call with the Head of Haverford's Lower School, Dr. Pam Greenblatt, the Does told Dr. Greenblatt that James recently reported to his father that he was called names such as "dummy," "stupid," the "b word," and the "n word."  *Id.* at ¶ 32.  Dr. Greenblatt's notes reflected that the Does did not share the specifics of where and when such names were used and, according to Dr. Greenblatt, the context of the conversation led her to believe this name-calling occurred during off-campus sporting events.  *Id.* at ¶ 33.  By contrast, the Does believe that they told Dr. Greenblatt that James was called the "n word" at Haverford.  *Id.*  This interaction between James and Student #1 was the only time that the plaintiffs allege that James was called the "n word" or experienced any racially motivated behavior at Haverford.  *Id.* at ¶ 34.

Within a few days, Dr. Greenblatt met with James's student support team to discuss whether anyone had overheard any of these names.[1]  *Id.* at ¶ 35.  Haverford decided to keep

---

[1] In her deposition, Dr. Greenblatt specifically stated: "I shared the [Does'] concerns about what had been — about what they had brought up and we discussed whether there had been any — whether anybody had overheard any of these, if there had been any indication of — I mean, they said that [James] was being called a 'dummy' and 'stupid.'"  DI 32-4 at 189.

James and Student #1 separated at school, especially during recess, and James's teacher reported on November 17th that this was going well.  *Id.* at ¶ 36.  Additionally, Dr. Greenblatt reported the plan for engaging with and monitoring James and any negative behavior directed toward him, to which Jane Doe expressed her appreciation.  *Id.* at ¶ 37.  At some point — though it is unclear if this occurred before or after James left Haverford — Rhonda Brown met with Student #1 to discuss the "n word" incident with him.  *Id.* at ¶ 38.  Though Student #1 denied using that word toward James, Brown spoke with him about the context of the word and why it was hurtful, and she made clear that he could not use this word.  *Id.*

Toward the end of November, James unfortunately continued to exhibit behavioral issues.  On November 28th he got into Student #1's face twice in the classroom, first telling Student #1 that he was not allowed to be in the reading corner and then telling him that he should stop working.  *Id.* at ¶ 42.  That same day, James punched Student #1 in the back, which James said he did in retaliation for Student #1 elbowing or pushing him the prior week — an incident the teacher had already addressed and believed was resolved.  *Id.*  Though James apologized to Student #1, his behavior worsened that day, with James tapping his pencil on his desk to distract other students, getting out of his seat, taking a pencil away from a classmate, banging his hands on his desk, telling a classmate that he was "going to pay for what he did," and throwing scissors across the room.  *Id.* at ¶ 43.  Because Haverford did not believe that James could safely and productively return to the classroom that day, the school asked Jane Doe to take him home.  *Id.*  James claimed he did not do anything of these things.  *Id.* at ¶ 45.

Jay Brown, the Dean of Students for Haverford's Lower School, spoke with Jane Doe about Haverford's concerns with James's behavior on the 28th.  *Id.* at ¶ 44.  During this

conversation, Jane Doe explicitly stated that Student #1 called James the "n word" at school. *Id.*
On December 1st, Jay Brown emailed the P.E. teacher and school counselor to ask if James
reported to them that Student #1 called James the "n word" in P.E. class; both stated that James
never said anything on that day about Student #1 using the "n word" and the counselor stated
that James first told her, and allegedly the P.E. teacher, about the incident during the week of
December 1st. DI 32-4 at 249, 325, 329.

On November 29th, James hit Student #1 on the top of the head with a book and refused
to attend his class' morning meeting. *Id.* at 214. At this time, Student #1 admitted to calling
James some mean names, including "dumby," but could not remember the other names. *Id.* The
next day, after being told he could not complete all the math practice problems on the board,
James ran out of the classroom, slammed the door, and stood outside making faces through the
window. *Id.* He also tapped his pencil on Student #1's desk, slammed his hands on the desk,
and got into Student #1's face before sitting in Student #1's chair and pretending to write on his
paper. *Id.* Unable to de-escalate the situation herself, James's teacher enlisted Jay Brown's
support, and Jay Brown facilitated James's pickup from school by Jane Doe. DI 35-1 at ¶ 49.
Haverford asked the Does to keep James home for the rest of the week. *Id.* at ¶ 50.

On December 1st, Dr. Greenblatt had a call with Jane Doe during which she discussed
James's escalating behavioral issues and Haverford's attempts to support him, and ultimately
asked Jane Doe to consider withdrawing James from Haverford. *Id* at ¶ 51; DI 32-4 at 319. Dr.
Greenblatt also explained that Haverford considered moving James's classroom — something
both the Does and Student #1's mother had requested — but that doing so contradicted
Haverford's policy and would destabilize the school community. DI 32-4 at 319. She further

stated, "At this point the school team is weighing whether we feel that we have an adequate ability to support [James] with the school resources we have available or if his needs extend beyond what we are capable of supporting in order to maintain a safe and effective learning environment for all kids." *Id.*; DI 35-1 at ¶ 51. During a December 14th call between Jane Doe, Dr. Greenblatt, and Haverford's Assistant Head of School, Mark Thorburn, Haverford reiterated its request for James's withdrawal from Haverford; stated they were providing this option so that the Does could possibly reapply to Haverford in the future — which James could not do if he was expelled — and; offered to facilitate his application to another school. DI 35-1 at ¶¶ 55-56. The Does then enrolled James at Highland Park Elementary School and, upon Haverford's follow-up email on January 6th regarding whether the Does would be withdrawing James, the Does informed Haverford that they had retained counsel. *Id.* at ¶¶ 57-58.

Additionally, on November 28th and continuing until August of the following year, James began seeing a therapist. *Id.* at ¶¶ 63-64, 68. James started seeing a different therapist in July 2024 and continues seeing them today "to work through his ability to self-regulate and deal with his emotions." *Id.* at ¶ 69. Ultimately, James completed his third-grade year at Highland Park and is now enrolled at The Walden School. *Id.* at ¶ 70.

As for Student #1, his mother testified that she was never made aware of any allegation that her son had used the n-word and that she heard about it for the first time from this lawsuit.[2] DI 35-2 at 59. She also attested that she never requested for James to be suspended, expelled, or subjected to any other disciplinary action. *Id.* at 63. Dr. Greenblatt stated that Student #1's

---

[2] Though we lack this portion of the testimony, Haverford claims that three different school officials contacted Student #1's mother about her son's behavior. DI 37-1 at ¶ 29.

mother never asked her to remove James from school. *Id.* at 94. Haverford's Head of the

School, Tyler Casertano, also asserted that he never spoke to Student #1's mother about James

once there was a documented conflict between the two boys at school. DI 32-4 at 178. Jane Doe

believes that Student #1's mother is friends with Mr. Casertano based on (1) seeing the two

chatting at a lacrosse game; and (2) Student #1's membership on a committee related to property

that Haverford purchased. DI 35-1 at ¶ 60. Jane Does thus believes that Student #1's mother

was involved in Haverford's request for James to withdraw. DI 35-1 at ¶ 61.

Finally, and relevant to Haverford's motion to exclude, plaintiffs obtained the testimony

of Raymond De Sabato, whom plaintiffs offer as an expert. Mr. De Sabato holds a bachelor's

degree in reading education and psychology and a master's degree in education, with a teaching

certification in reading and language arts and a focus on administration. DI 31-2 at 3. He

worked in the education field from approximately 1977-2022 as a teacher, coach, assistant

principal, principal, and assistant head of school at private schools at the middle-and-high-school

levels. *Id.* at 8-9. In his report, De Sabato concluded that Haverford breached its duty and the

professional standard of care with respect to James by failing to (1) "reasonably investigate and

address the allegations of racial harassment and discrimination of [James]" and (2) "[a]ct[ing]

unreasonably in the manner in which it disciplined [James] by removing him from the School in

the middle of [the] third grade year." *Id.* at 4, 7.

De Sabato described his expert methodology as "includ[ing] the gathering, review, and

analysis of all available and relevant documents, evidence, information, and testimony." *Id.* at 3.

He stated his review and analysis were based on his "education, training, and professional

experience in the field of education administration" and that it was focused on evaluating

whether Haverford (1) "maintained and implemented appropriate policies, procedures, and employee and student training that were reasonably intended to adequately supervise the School's students and prevent, detect, investigate, report, and remediate racial harassment/abuse of the School's students, including [James]"; (2) "acted with deliberation and without bias, whether or not it properly investigated and addressed allegations of racial harassment and discrimination of [James]"; and (3) enacted a reasonable and appropriate disciplinary process for James, including his forced removal from Haverford. *Id.*

## II.    MOTIONS AT ISSUE

### A.    Haverford's motion to exclude expert testimony

Haverford moves to exclude the expert opinions, report, and testimony of Mr. De Sabato. DI 31. It asserts that Mr. De Sabato lacks the "specialized knowledge" required to render an expert opinion under Rule 702 of the Federal Rules of Evidence because his purported expertise is based solely upon his career as an educator, rather than any specialized training or education. *Id.* at 6-8; F.R.E. 702. Haverford insists that Mr. De Sabato's opinions also lack a reliable basis because he did not form them by using any scientific method, technical expertise, or specialized skill; rather, Haverford asserts that Mr. De Sabato used his own subjective experience and beliefs to form his opinions. DI 31 at 8-10. Nor, Haverford argues, do Mr. De Sabato's opinions relate to matters requiring scientific, technical, or specialized knowledge. *Id.* at 10-12. Haverford further emphasizes that Mr. De Sabato's experience has been limited to private religious schools, none of which involved grade school students. DI 38 at 2. According to Haverford, Mr. De Sabato's testimony would only confuse, rather than help, the jury. *Id.* 38 at 1.

Plaintiffs oppose Haverford's motion, contending that Mr. De Sabato demonstrated his

extensive experience regarding discipline — including discipline for alleged sexual or racial harassment — as well as his approach to such disciplinary investigations. DI 36 at 7-10. They highlight Mr. De Sabato's discussion of best practices for dealing with struggling students, from the perspective of the private school experience. *Id.* at 11-12. In plaintiffs' view, Mr. De Sabato's testimony will aid the jury in evaluating the core questions of this case and his testimony should be admitted pursuant to the liberal policy of admitting expert testimony in federal court. *Id.* at 12-13.

## B.    Haverford's motion for summary judgment

Haverford also moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. Pro. 56(a). For the plaintiffs' § 1981 discrimination claim, Haverford avers that (1) there is no direct or circumstantial evidence of intentional discrimination by any Haverford agent or employee; (2) it had a legitimate, non-discriminatory reason for seeking James's withdrawal; and (3) the plaintiffs cannot establish pretext or but-for causation. DI 32-2 at 33-39. Haverford further asserts that summary judgment is warranted on the § 1981 retaliation claim because (1) the plaintiffs did not establish an underlying § 1981 violation; (2) the plaintiffs cannot otherwise demonstrate a *prima facie* case of § 1981 retaliation; (3) Haverford provided a legitimate, non-retaliatory reason for requesting James's withdrawal; and (4) the plaintiffs cannot show pretext. *Id.* at 39-48. As for the state law claims, Haverford argues the plaintiffs failed to demonstrate that Haverford breached any specific contractual provision. *Id.* at 48-50. Because the parties have an express contract, Haverford maintains that this precludes the plaintiffs' implied contract claim. *Id.* at 51. Haverford further contends the plaintiffs' negligence claim is barred by the gist of the action doctrine and that, regardless, it owed no duty of care to James

independent of its contractual obligations. *Id.* at 52-54. Likewise, Haverford insists it owed no fiduciary duty to James. *Id.* at 55-56. Finally, Haverford argues it did not (1) engage in extreme or outrageous conduct toward the plaintiffs; (2) act with the intent to cause the plaintiffs any emotional distress; or (3) cause the plaintiffs severe, ongoing distress. *Id.* at 57-62. Globally, Haverford faults the plaintiffs for their alleged misrepresentations of the record. DI 37 at 1-3.

Plaintiffs respond in opposition to Haverford's motion for summary judgment. DI 35. Regarding their § 1981 discrimination claim, they maintain there are genuine issues of material fact, particularly respecting Haverford's intent to racially discriminate against James and its pretextual reason for seeking his withdrawal. *Id.* at 14-17. Plaintiffs similarly insist that there are genuine issues of material fact relevant to their Section 1981 retaliation claim because (1) they need not establish an underlying § 1981 violation to prevail on a retaliation claim; and (2) they have presented sufficient evidence to suggest a causal link between their report of racial discrimination and James's dismissal from Haverford. *Id.* at 17-20. As to their contract claims, plaintiffs assert there are genuine issues of material fact respecting whether Haverford breached its contractual obligations by unreasonably exercising its discretion. *Id.* at 20-22. Nor, plaintiffs maintain, is summary judgment warranted on their negligence or fiduciary duty claims because there is a genuine issue of fact as to whether Haverford owed broader duties of care toward James. *Id.* at 22-27. Finally, plaintiffs contend that they have presented sufficient facts to demonstrate a genuine question as to whether Haverford's conduct was extreme and outrageous and whether such conduct caused James severe emotional distress. *Id.* at 27-29.

## III.    STANDARD OF REVIEW

### A.    Expert testimony

Under Federal Rule of Evidence 702, a party may offer a witness as an expert in a case if it demonstrates, by a preponderance of the evidence, the following: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." F.R.E. 702. The Rule 702 inquiry is "a flexible one" that requires us to ensure that all admitted expert evidence and testimony is relevant and reliable, such that it is based upon reasoning or methodology that is (1) valid and (2) capable of application to the facts of the case. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993). "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact[]" and Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citations omitted).

## B.    Summary judgment

Summary judgment is appropriate when the movant demonstrates "that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021) (citation omitted). When considering a motion for summary judgment, we must "view the record and draw inferences in a light most favorable to the non-moving party." *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation omitted). We also must assess whether "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C.    Section 1981 discrimination

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  § 1981(a).  The statute defines "make and enforce contracts" to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b). "To establish a right to relief under § 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts."  *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002) (citation and internal quotation omitted).  In determining whether the defendant intentionally discriminated against the plaintiff on the basis of race, we may use from the employment context both the direct evidence test from *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), and the burden-shifting test from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267-68 (3d Cir. 2010) (citations omitted).

There are three stages to the *McDonnell Douglas* framework: (1) the plaintiff must demonstrate a *prima facie* case of discrimination; (2) if the plaintiff succeeds in doing so, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action against the plaintiff; and (3) if the defendant succeeds, then the plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered legitimate reasons

were mere pretext for discrimination. *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999)

(*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). The burden

of proving a *prima facie* case is not onerous, as a *prima facie* case "merely raises an inference of

discrimination only because we presume these acts, if otherwise unexplained, are more likely

than not based on the consideration of impermissible factors." *Sempier v. Johnson & Higgins*,

45 F.3d 724, 728 (3d Cir. 1995) (*citing Furnco Construction Co. v. Waters*, 438 U.S. 567, 577

(1978)) (internal quotations omitted). While a plaintiff's subjective belief that race impacted the

defendant's actions is insufficient to demonstrate an inference of discrimination, we may infer

discrimination from the defendant's more favorable treatment of a similarly situated person

outside of the plaintiff's class. *Rodriguez v. AMTRAK*, 532 Fed. Appx. 152, 153 (3d Cir. 2013)

(citation omitted). Additionally, the Third Circuit has considered evidence of a defendant's

failure to investigate, or disparate discipline, in evaluating whether a plaintiff has demonstrated

an inference of discrimination. *See, e.g.*, *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007),

*overruled on other grounds by Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017)

(reversing the district court's grant of summary judgment for the employer on a Title VII hostile

work environment claim because a reasonable juror could conclude the employer "failed to take

prompt and adequate remedial action after learning of the alleged harassment" against the

employee); *see also Davis v. Nat'l R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 487 (D. Del.

2010) (holding the defendant's failure to investigate the plaintiff's harassment complaints

constituted discrimination under Title VII); *Shealey v. Pittsburgh Mercy Health Sys., Inc.*, 2025

WL 327310, *5-*6 (W.D. Pa. Jan. 29, 2025) (concluding the employer's failure to investigate an

employee's report of a patient's use of the "n-word" supported an inference of racial

16

discrimination).

If the plaintiff establishes a *prima facie* case of intentional discrimination, and the defendant then proffers a legitimate, non-discriminatory reason (LNDR) for its action, the burden shifts back to the plaintiff to overcome the defendant's proffered LNDR. This requires the plaintiff to point to direct or circumstantial evidence from which the factfinder could either reasonably (1) disbelieve the employer's proffered LNDR; or (2) believe that, more likely than not, an invidious, discriminatory reason was a determinative or motivating cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 763-64 (3d Cir. 1994) (citations omitted); *Steele v. Pelmor Labs. Inc.*, 642 Fed. Appx. 129, 134 (3d Cir. 2016) (citation omitted). Plaintiff cannot avoid summary judgment merely by arguing that the factfinder need not believe the proffered LNDR; however, the plaintiff need not provide evidence directly contradicting that LNDR. *Fuentes*, 32 F.3d at 764 (citation omitted). Rather, to survive summary judgment, the plaintiff's evidence rebutting the proffered LNDR must enable the factfinder to reasonably infer that each of the proffered LNDRs was a pretext or *post hoc* fabrication for the defendant's action. *Id.* (citations and footnote omitted). The plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (citations, internal quotations, and footnote omitted). To prevail in a § 1981 case, the plaintiff must "prove that, but for race, [they] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020); *Williams v. Tech. Mahindra (Ams.) Inc.*, 70

F.4th 646, 651 (3d Cir. 2023) (citation omitted).

## D.    Section 1981 retaliation

A party may also bring a retaliation claim under 42 U.S.C. § 1981.  To do so, he must make the following *prima facie* showing: "(1) [he] engaged in [protected] activity[;] (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action."  *Castleberry*, 863 F.3d at 267 (citation omitted).  The plaintiff must establish "that there had been an underlying section 1981 violation" and that they "have acted under a good faith, reasonable belief that a violation existed."  *Id.* (*citing Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)); *see also Daniels*, 776 F.3d at 193 (stating a plaintiff alleging a Section 1981 retaliation claim "need not prove the merits of the underlying discrimination complaint" but must have acted in good faith that such a violation existed) (citation omitted).

To prove causation, "a plaintiff may rely on the temporal proximity between [protected activity and an employer's adverse action] if 'unusually suggestive.'"  *Daniels*, 776 F.3d at 196 (citations omitted); *see also Kern v. DAS Companies Inc.*, 2025 WL 2170324, *9 n.4 (3d Cir. July 31, 2025) (explaining "unusually suggestive" has typically meant "no more than a handful of days").  But the mere fact that adverse employment action occurred after a complaint was made is typically insufficient to establish causality.  *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (citation omitted).  Where there is no such temporal proximity, we evaluate the circumstances in their entirety and specifically examine "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when

taking the adverse action." *Daniels*, 776 F.3d at 196 (citations omitted).  However, the plaintiff must demonstrate that the defendants knew of the plaintiff's protected conduct when they acted. *Id.* at 196-97 (citations omitted).  The causation inquiry "is highly context-specific." *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997).  Moreover, "the absence of immediacy between the cause and effect does not disprove causation," *id.*, and where there is no such temporal proximity, we may examine the intervening period for other indicia of retaliatory animus and find causation satisfied.  *Krouse*, 126 F.3d at 503-04.  But intervening events may break the causal chain between an employee's protected conduct and an adverse employment action.  *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 618 (E.D. Pa. 2014) (citation omitted); *Houston v. Dialysis Clinic, Inc.*, 2015 WL 3935104, at *11 (D.N.J. June 26, 2015) (explaining that "inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that independently . . . caused the adverse action.") (citations omitted).  Furthermore, the Third Circuit "has declined to infer such a causal link where an employee's negative performance evaluations predated any protected activity." *Verma v. Univ. of Pa.*, 533 Fed. Appx. 115, 119 (3d Cir. 2013) (*citing Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000)); *Mikell v. Marriott Int'l, Inc.*, 789 F. Supp. 2d 607, 620 (granting summary judgment on Section 1981 retaliation claim where the plaintiff "had already engaged in the non-protected conduct that was the basis for the decision to terminate . . . and [the defendant] was already contemplating termination.") (citations and internal quotations omitted); *Gairloch v. Pa. State Univ.*, 84 F. Supp. 3d 407, 420 (M.D. Pa. 2015) (concluding that the defendant's poor performance review of the plaintiff and actions to address such issues, prior to and continuing after the plaintiff's protected activity, defeated the

plaintiff's causation argument) (citations omitted).

**D.    State law claims**

Three elements are required to establish a breach of contract under Pennsylvania law:
"(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3)
resultant damages." *Meyer et al. v. Law Firm of Mallone Middleman PC*, 137 A.3d 1247, 1258
(Pa. 2016). Additionally, Pennsylvania law implies a duty of good faith and fair dealing upon
parties who contract. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 223 (3d Cir. 2022);
*Corsale v. Sperian Energy Corp.*, 819 Fed. Appx. 127, 130 n.2 ("[E]very contract under
Pennsylvania law imposes a duty of good faith and fair dealing in the performance and
enforcement of the contract") (citation omitted). Though the implied duty of good faith cannot
override the contract's express terms, it may fill in the gaps by supplying terms not expressly
stated in the contract. *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 627 (W.D. Pa.
2013) (citation omitted). Moreover, a party may violate its duty of good faith by exercising its
discretion, authorized in a contract, in an unreasonable manner. *Montanez v. HSBC Mortg.
Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012) (citation omitted).

If there is no express agreement addressing the same subject matter, a party may bring a
claim for an implied-in-fact contract. *Martin v. Snap-Tite, Inc.*, 641 Fed. Appx. 126, 129 (3d
Cir. 2016) (citation omitted). Such a contract "is an actual contract which arises where the
parties agree upon the obligations to be incurred, but their intention, instead of being expressed
in words, is inferred from acts in the light of the surrounding circumstances." *Hickey v. Univ. of
Pittsburgh*, 81 F.4th 301, 310 (3d Cir. 2023) (citations omitted). The implied contract is only
valid if it is "entirely unrelated to the express contract." *Martin*, 641 Fed. Appx. at 129 (citation

20

omitted).

To prove negligence under Pennsylvania law, the plaintiff must establish: (1) the defendant had a duty or obligation recognized under the law; (2) the defendant failed to conform to the standard required by that duty; (3) the defendant's conduct caused the plaintiff's injury; and (4) the plaintiff suffered actual damage or loss as a result. *In re TMI Gen. Pub. Utils. Corp.*, 67 F.3d 1103, 1117 (3d Cir. 1995) (citations omitted). Pennsylvania also recognizes the gist of the action doctrine, which "prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC*, 24 F.4th at 216 (citation omitted). "Tort actions arise from the breach of a duty owed to another as a matter of social policy, while breach-of-contract actions arise from the breach of a duty created by contract." *Id.* (citation omitted). "When a duty is created by contract, the gist of the action doctrine requires that a claim for a breach of that duty be brought in contract, not tort." *Id.* (citation omitted). We examine "the nature of the duty breached" — if the duty breached was one created by the parties pursuant to the terms of their contract, then the claim is properly viewed as a breach of contract, whereas if the claim alleges a violation of a broader social duty owed to every individual, then the claim is properly viewed as a tort. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 63, 68 (Pa. 2014) (citations omitted). In the context of private boarding schools, some courts have concluded that such schools owe broader social duties to the students under their care. *See, e.g.*, *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 437 (M.D. Pa. 2018).

Pennsylvania law also recognizes a breach of a fiduciary duty. To prevail on such a claim, the plaintiff must establish (1) that a fiduciary relationship between the defendant and plaintiff existed; (2) the defendant intentionally or negligently failed to act with good faith and

solely for the plaintiff's benefit; and (3) the breach of the fiduciary duty caused the plaintiff to be injured. *Avco Corp. v. Turner*, 2022 WL 2901015, at *1 (3d Cir. July 22, 2022) (footnote omitted). In determining whether a fiduciary relationship exists, courts typically evaluate whether the parties clearly "did not deal on equal terms." *Frowen v. Blank*, 425 A.2d 412, 416 (Pa. 1981) (citations omitted). Courts have recognized a fiduciary relationship between students and private residential schools that purport to stand *in loco parentis* to their students. *See, e.g.*, *Wartluft v. Milton Hershey Sch. & Sch. Trust*, 400 F. Supp. 3d 91, 111-112 (M.D. Pa. 2019).

Finally, a party may seek relief for the intentional infliction of emotional distress for a defendant's "extreme or outrageous" conduct. *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (citation omitted). Such conduct must be "so extreme as to permit recovery" and recovery will only be granted "in limited circumstances where the conduct has been clearly outrageous." *Id.* (citations omitted). In essence, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (citation omitted).

## IV. DISCUSSION

### A. Raymond De Sabato's expert testimony must be excluded because there was no articulated reliable methodology for his opinion

We conclude that Mr. De Sabato's expert testimony must be excluded under Rule 702. Preliminarily, we find that Mr. De Sabato possessed specialized knowledge that would enable the factfinder to understand the evidence or facts in issue — namely, his expertise as a teacher and administrator at private schools for 50 years, during which he discussed disciplinary strategies and procedures and, at times, deployed them himself. Mr. De Sabato qualifies as an expert under Rule 702's liberal policy of admission. *See Kannankeril*, 128 F.3d at 806 (citations

omitted).

However, Mr. De Sabato did not articulate a reliable method through which he reached his opinions in this case.  He described his expert methodology as "includ[ing] the gathering, review, and analysis of all available and relevant documents, evidence, information, and testimony" based upon his "education, training, and professional experience in the field of education administration."  DI 31-2 at 3.  Mr. De Sabato further explained that his analysis focused on Haverford's maintenance and implementation of racial harassment and abuse procedures, its investigation into such alleged harassment, and its disciplinary process for James. *Id.*  This is not a methodology in the Rule 702 sense, but is rather a description of how thinking works: collect and assess the relevant information and use experience to reach a conclusion.  But what's missing is any indication of how the jury will be able to follow along with that thought process if challenged — a critical safeguard of Rule 702.  Mr. De Sabato speaks in broad strokes about his focus on school procedures for racial harassment and abuse and investigations into such allegations, without providing any details as to what an effective or ineffective system looks like.  Nor does he offer any insight into what an appropriate disciplinary process would be for a student exhibiting James's behaviors.  It is simply not enough to say, "I reviewed the relevant documents, based upon my experience in this space, and reached my conclusions by focusing on the things I was asked to assess."  Because that is essentially what Mr. De Sabato has done here, we exclude his expert testimony.[3]

---

[3] Even if we admitted Mr. De Sabato's expert testimony, this would not affect our summary judgment analysis because his testimony does not address our conclusion that James's escalating conduct from November 28th through November 30th — rather than his report of racial discrimination — caused Haverford to seek James's withdrawal.  This conclusion is fatal to both of plaintiffs' § 1981 claims.

**B.    Summary judgment in favor of Haverford is warranted on plaintiffs' § 1981 discrimination claim because plaintiffs cannot overcome Haverford's proffered LNDR**

The first two stages of the *McDonnell Douglas* framework are satisfied in this case. First, plaintiffs demonstrated a *prima facie* case of discrimination because Haverford's actions in response to plaintiffs' report of racial discrimination give rise to an inference of discrimination. The record reveals that Student #1's mother never heard about her son's alleged use of the "n word" against James. DI 35-2 at 59. Moreover, the Haverford student support team for James exhibited poor communication with respect to the "n word" incident. Though Dr. Greenblatt stated that she met with the support team within a few days of first learning about the incident — sometime around November 10th — Jay Brown, the Dean of Students for Haverford's Lower School, stated that he first learned of this incident on November 28th. DI 32-4 at 189; DI 35-1 at ¶ 44. It was not until December 1st that Jay Brown contacted James's counselor and P.E. teacher to ask whether James reported the "n word" incident when it allegedly occurred. DI 32-4 at 249, 325, 329. The record also suggests that there was no immediate action taken to address Student #1's alleged use of the "n word" with Student #1 and that the sole contact Haverford had with Student #1 about this incident was one conversation between Rhonda Brown and Student #1, sometime in November or December. DI 35-1 at ¶ 38. We thus find that Haverford's failure to investigate plaintiffs' report of the use of the "n word" against James raises an inference of discrimination sufficient to establish a *prima facie* case under § 1981. *See Andreoli*, 482 F.3d at 649; *Davis*, 733 F. Supp. at 487; *Shealey*, 2025 WL 327310 at *5-*6.

Because plaintiffs established a *prima facie* case of intentional discrimination, the burden then shifts to Haverford to provide an LNDR for its action. It easily clears this hurdle.

Haverford asserts that James's "sustained behavioral difficulties . . . demonstrated in the classroom . . . ultimately rose to a level that Haverford could no longer accept."  DI 32-2 at 38. The record shows that James exhibited behavioral issues since enrolling at Haverford for pre-K. DI 35-1 at ¶¶ 5-8.  These problems worsened when he began third grade, and involved physical conflicts with multiple students, as well as disruptive conduct during class.  *Id.* at ¶¶ 12-30. James had frequent physical incidents with Student #1 during the fall of his third-grade year, though his issues were not limited to Student #1.  But the conduct that "ultimately rose to a level that Haverford could no longer accept" evidently occurred at the end of November, during a three-day period of particularly difficult behavior from James.  Among other conduct, from November 28th to November 30th, James (1) got in Student #1's face three times, at one point slamming his hands on Student #1's desk; (2) punched Student #1 in the back; (3) took a pencil from another classmate; (4) banged his hands on that classmate's desk; (5) told a classmate he was "going to pay for what he did"; (6) threw scissors across the room; (7) hit Student #1 on the head with a book; and (8) ran out of the classroom, slammed the door, and made faces through the window.  *Id.* at ¶¶ 42-48.  These facts are supported by the notes and testimony of school staff, and not contradicted by any of plaintiffs' evidence.  Rather, John and Jane Doe merely assert that they believe James, who purportedly denies this conduct — even though neither John nor Jane Doe were present for any of this conduct.  *Id.*  On the third day of James's worsening behavior, Haverford asked the Does to keep James at home for the rest of the week.  *Id.* at ¶ 50. At this time, Haverford was considering whether it could adequately support James given his needs and its responsibility to maintain a safe and effective learning environment for its students. *Id.* at ¶ 51.  Haverford first asked the Does to consider withdrawing James on December 1st, and

then again on December 14th.  *Id* at ¶¶ 51, 55.

In our view, James's escalating behavior constituted a legitimate, non-discriminatory basis for Haverford's request that the Does withdraw James.  This behavior was undoubtedly serious and hampered the safety and effectiveness of the learning environment.  Despite Haverford's numerous efforts throughout the school year, and throughout James's tenure at Haverford, Haverford could not effectively manage James's behavior and support him.  It thus made the decision to request James's withdrawal shortly after this escalation.  We conclude that Haverford has met its burden to provide an LNDR for its action under *McDonnell Douglas*.

Accordingly, the burden then shifts back to plaintiffs to establish Haverford's proffered LNDR was mere pretext for racial discrimination.  This the plaintiffs cannot do.  In our view, plaintiffs have not shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Haverford]'s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" such that Haverford "did not act for [the asserted] non-discriminatory reasons."  *Fuentes*, 32 F.3d at 765 (citations, internal quotations, and footnote omitted).  As illustrated above, James had a well-documented history of behavioral issues at Haverford, which significantly escalated in his last three days there.  James's behavior was so serious that, on two of these three days, Haverford asked Jane Doe to bring James home for the rest of the day.  Plaintiffs provide no evidence to dispute this, nor do they provide any reason — aside from their own beliefs, which are unsupported by the record — to infer that Haverford crafted James's behavior as an excuse to kick him out of school for racially motivated reasons.  And though Haverford's investigation into the "n word" incident certainly could have been more prompt and robust, nothing in the record indicates that Haverford itself

26

possessed any racial animus toward James nor condoned the use of the "n word" at school.

For these reasons, we find that the plaintiffs cannot point to evidence from which the factfinder could either reasonably disbelieve Haverford's proffered LNDR or believe that racial discrimination was, more likely than not, a determinative or motivating cause of its request for James's withdrawal. *Fuentes*, 32 F.3d at 763-64 (citations omitted); *Steele*, 642 Fed. Appx. at 134 (citation omitted). As plaintiffs do not meet their burden under the *McDonnell Douglas* test, we grant summary judgment against them on their § 1981 discrimination claim.

**C.    Summary judgment in favor of Haverford is warranted on plaintiffs' § 1981 retaliation claim because plaintiffs cannot establish causality**

Setting aside the questions of whether James engaged in protected activity, or whether Haverford took adverse action against him, we conclude that summary judgment should be granted against plaintiffs on their § 1981 retaliation claim because they cannot establish a causal connection between any alleged protected activity and adverse action. Nothing in the record directly links James's report of racial discrimination to Haverford's request for his withdrawal. Nor is the temporal proximity between James's report and Haverford's request "unusually suggestive." *Daniels*, 776 F.3d at 196 (citations omitted). As the Third Circuit recently explained, "unusually suggestive" typically means "no more than a handful of days" passed between the protected activity and the adverse action. *Kern*, 2025 WL 2170324, at *9 n.4. Twenty-two days passed between James's report and Haverford's request for his withdrawal — far more than a handful of days, and in the context of this particular series of events, 22 days is significant. Moreover, we conclude that James's escalating conduct between November 28th and November 30th constituted "intervening events" that broke any causal chain between James's report of discrimination and Haverford's withdrawal request. *Kier*, 72 F. Supp. 3d at

27

618; *see also Houston*, 2015 WL 3935104 at *11.  So, too, did James's significant behavioral issues prior to his report of discrimination weaken the causal link between that report and Haverford's request.  *See Verma*, 533 Fed. Appx. at 119; *Mikell*, 789 F. Supp. 2d at 620; *Gairloch*, 84 F. Supp. 3d at 420.  For these reasons, we grant summary judgment in Haverford's favor on plaintiffs' retaliation claim.

**D.    Because we grant summary judgment on plaintiffs' federal claims, we decline to exercise supplemental jurisdiction over their state claims**

Having granted summary judgment in Haverford's favor on each of plaintiffs' federal claims, the only remaining claims arise from state law: breach of contract, breach of implied contract, breach of fiduciary duty, negligence, and intentional infliction of emotional distress. Under 28 U.S.C. § 1367, in any civil action over which we have original jurisdiction, we may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  We may decline to exercise supplemental jurisdiction over a claim if we have "dismissed all claims over which [we] [have] original jurisdiction."  28 U.S.C. § 1367(c)(3).  "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citation omitted).  Absent "extraordinary circumstances" we should refuse to exercise supplemental jurisdiction where no viable federal claims remain.  *Shaffer v. Bd. of Sch. Directors of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (citation omitted).

Our jurisdiction in this matter arose from plaintiffs' federal claims under § 1981. Because we have now disposed of those claims on summary judgment in defendants' favor, we

decline to exercise supplemental jurisdiction over plaintiffs' remaining state claims. Plaintiffs are free to refile their state claims in the proper state court.

**V.    CONCLUSION**

Summary judgment is granted in favor of defendants on plaintiffs' § 1981 discrimination and retaliation claims. As those federal claims provided the sole basis for our jurisdiction, we decline to exercise supplemental jurisdiction over plaintiffs' remaining state claims. This decision is without prejudice to plaintiffs' ability to refile their state claims in state court.